# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **WENNOA PEEBLES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  7:16-cv-01803-RDP** |
| | } | |
| **GREENE COUNTY HOSPITAL BOARD,** | } | |
| **et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on the Motion for Summary Judgment filed by Defendants Greene County Hospital Board ("GCH") and Elmore Patterson ("Patterson") (collectively "Defendants"). (Doc. # 30). The Motion is fully briefed, and the parties have filed evidentiary submissions. (Docs. # 30-40). After careful review, the court concludes that the Motion is due to be granted.

## I.    Relevant Undisputed Facts[1]

GCH operates a hospital, physician clinic, and residential care facility in Eutaw, Alabama. (Doc. # 32-1 at ¶ 2). In September 2013, GCH hired Patterson as its Chief Executive Officer ("CEO"). (*Id.* at ¶ 1). Also in September 2013, GCH hired Plaintiff Wennoa Peebles ("Plaintiff" or "Peebles") to work as a Certified Nursing Assistant at the residential care facility. (Doc. # 32-2 at p. 12). When she was hired, GHC provided her with a copy of the GCH

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Employee Handbook, which instructs employees to report all incidents of sexual harassment to their supervisor, administrator, or any other member of the management. (*Id.* at p. 18, 157-58).

Plaintiff applied to be Patterson's Executive Assistant in October 2013. (*Id.* at p. 15). In November 2013, Plaintiff was selected for the Executive Assistant position. (Doc. # 32-1 at ¶ 3). Plaintiff held the positions of Executive Assistant and Accounts Payable Clerk and worked in the GCH business office until her termination. (Docs. # 32-1 at ¶¶ 3, 5; 32-4 at p. 22-23). All of the employees stationed to work in the business office were female. (Docs. # 32-1 at ¶ 5; 32-2 at p. 28). As Executive Assistant, Peebles received and directed phone calls, managed Patterson's schedule, and performed other secretarial duties. (Doc. # 32-1 at ¶ 3). As Accounts Payable Clerk, Peebles issued checks to pay bills as directed by her supervisors and communicated with bill collectors and vendors. (Doc. # 32-2 at p. 16). Plaintiff's direct supervisor was JoAnne Cameron ("Cameron"), the Business Office Manager. (*Id.* at p. 16-17). Patterson also supervised Peebles. (*Id.* at p. 18).

Within two to three months of Patterson becoming CEO, former board member Charles Robertson ("Robertson") sent Patterson a letter addressing the unprofessional attire that some female employees were wearing in the workplace and the overt and disrespectful statements Robertson had heard that Patterson was making to female employees.[2] (Doc. # 36 at p. 172-73). After beginning to work with Patterson, Peebles noticed that Patterson used profanity in the workplace. (Doc. # 32-4 at p. 18). At least once during a meeting, Patterson told Peebles that she was "just part of the room" and was "not to speak." (Docs. 32-2 at p. 39-40; 32-4 at p. 24; 36 at p. 130, 155). Plaintiff alleges (and Defendants deny) that Patterson made several other derogatory comments to herself and to other female employees. (Docs. # 34 at p. 6; 40 at p. 2-3).

---

[2] Defendants deny that this letter was about sexual harassment. (Doc. # 40 at ¶ 12). Patterson contends that the letter was about employee issues generally. (Doc. # 32-4 at p. 18-19).

For instance, Peebles alleges (and Defendants deny) that Patterson referred to females as "opossums," stated that he would not sleep with the "opossums," and commented about paddling a female employee. (Doc. # 32-2 at p. 23, 38, 43).

On October 5, 2015, GCH received an anonymous email[3] complaining about the management of GCH and questioning Patterson's uses of funding, hiring choices, and overall management style. (Doc. # 32-2 at p. 168-70). The email also contained private information regarding the salaries of certain GCH employees. (*Id.*). When Patterson vented about this email to Peebles, Peebles in some way indicated that Vickie Cockrell ("Cockrell"), the Human Resources Coordinator for GCH, had disclosed the salary information that was included in the email. (Doc. # 32-2 at p. 48-49). However, when Patterson asked Peebles to sign a statement that Cockrell was involved in disclosing this information, Peebles refused to do so because, according to Peebles, the statement was untrue. (*Id.*).

On October 8, 2015, Plaintiff's counsel sent a letter to Patterson and Sue Vance ("Vance"), the Chairperson of GCH, stating that Peebles had (1) previously reported to them "the deteriorating working conditions to which she is subjected" and (2) "experienced discrimination and retaliation at the hands of [GCH's] CEO, Elmore Patterson, and others within management." (Doc. # 32-1 at p. 6-7). The letter also stated that counsel had begun the process of involving the Equal Employment Opportunity Commission ("EEOC") regarding Peebles's complaints. (*Id.*). Plaintiff filed a Charge of Discrimination with the EEOC on November 4, 2015. (Doc. # 32-2 at p. 165-67). The Charge alleges sex discrimination, retaliation, and a hostile work environment. (*Id.* at p. 165).

---

[3] This email was written by a GCH employee who was later terminated. (Doc. # 32-2 at p. 48). The parties have not suggested that Peebles had any involvement with this email.

In 2015, Plaintiff complained to Vance about Patterson's behavior.[4] (Doc. # 35 at p. 10). Vance told Peebles to "keep [her] own records." (*Id.* at p. 10-11). At various points, Peebles also complained to board members Fred Hughes ("Hughes"), Ralph Banks, Robertson, Loretta Webb, and Johna Madison about Patterson's behavior generally and about Patterson telling Peebles to sign a statement against Cockrell, in particular. (Doc. # 32-2 at p. 56-64). Other female employees had also complained to board members about Patterson's behavior. (Doc. # 35 at p. 63-69, 185-88). Cameron occasionally heard Plaintiff "bl[o]w[ing] off steam about whatever was bothering her," including her work for and interactions with Patterson. (Doc. # 36 at p. 152, 163). For instance, Cameron overhead Peebles stating that Patterson said that Peebles's "brain was so small it could fit up a gnat's behind" and that Peebles's "hair looked butch." (*Id.* at 163). However, although at some point Plaintiff complained to Cameron about another employee, Plaintiff never directly made any complaints to Cameron about Patterson. (*Id.* at p. 152, 163).

On November 16, 2015, Vance sent Plaintiff a letter stating that GCH had designated board member Hughes to receive complaints related to Peebles's work environment. (Doc. # 32-1 at p. 9). The letter directed Plaintiff to send any complaints to Hughes in writing and informed Peebles that she could contact Vance if she felt that her complaints were not adequately addressed or if she felt uncomfortable sending her complaints to Hughes. (*Id.*). In the letter, Vance also offered Peebles the option of transferring back to her previous position as a Certified Nursing Assistant at her then current hourly wage. (*Id.*).

On January 19, 2016, Patterson received an email from the Murkin Group, a debt collector for one of GCH's creditors, regarding a debt collection matter. (Doc. # 32-1 at p. 11-

---

[4] It is unclear when in 2015 Plaintiff made this complaint to Vance.

12).  Two of the personal email addresses of GCH board members (Vance and Hughes) were copied on the email.[5]  (Docs. # 31 at ¶ 14; 32-1 at p. 11-12).  Because Peebles was responsible for routing incoming debt collection calls, Patterson suspected that she had provided these personal email addresses to the debt collector, but when Patterson asked Peebles if she had given the debt collector these address, she denied doing so.  (Docs. # 31 at ¶ 14-15; 32-1 at p. 11-12).  Peebles also told Patterson that she referred the only debt collection call from the Murkin Group to Tiffany Grisby ("Grisby"), the Chief Financial Officer of GCH, as she had been directed to do.  (Docs. # 32-1 at p. 11; 32-2 at p. 192; 32-3 at p. 7).  However, before Peebles's termination, a representative from the Murkin Group informed Patterson, through GHC's counsel, that Peebles did in fact provide these personal email addresses during a telephone conversation on December 18, 2015.  (Doc. # 32-1 at ¶ 11).

On January 27, 2016, GCH terminated Plaintiff's employment.  (Docs. # 32-1 at ¶ 12; 32-1 at p. 14; 32-2 at p. 64).  Defendants contend that Plaintiff's termination was based on her disclosure of confidential information, including the personal email addresses of GCH board members to the Murkin Group, and on her dishonesty in denying that she disclosed these addresses.  (Docs. # 32-1 at ¶ 12; 32-1 at p. 14; 32-2 at p. 64).  Plaintiff alleges that if she provided these email addresses[6] it was because neither Patterson nor Grisby would return the creditor's calls and that her conduct in disclosing these addresses was clearly within her responsibility as Accounts Payable Clerk.  (Doc. # 32-2 at p. 65).  Plaintiff asserts that the actual reason for her termination was her complaints of discrimination.  (Doc. # 36 at p. 28).  Following

---

[5] Peebles was not authorized to disclose the personal email addresses of board members of GCH.  (Docs. # 32-1 at ¶ 10; 32-2 at p. 192-93).

[6] Peebles claims to have no recollection of disclosing these personal email addresses.  (Doc. # 32-2 at p. 65).  However, she claims that, if she did, she was merely providing the creditor with the necessary chain of command since Patterson and Grisby were not returning the creditor's calls.  (*Id.*).

Plaintiff's termination, her position was filled by another female employee. (Doc. # 32-4 at p. 28).

## II.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

**IV.    Analysis**

In her Amended Complaint, Plaintiff alleges the following claims against Defendants: (1) sexually hostile work environment in violation of Title VII, (2) sexual harassment and gender discrimination in violation of Title VII, (3) outrage, and (4) negligent training, supervision, and retention.  (Doc. # 6).  Plaintiff has conceded that the Title VII claims against Patterson are due to be dismissed.  (Doc. # 34 at p. 12).  The court addresses the merits of Plaintiff's Title VII claims against GCH and state law claims against GCH and Patterson, in turn.

**A.    Title VII Sexually Hostile Work Environment Claim**

In order to establish a claim of sexually hostile work environment under Title VII, a plaintiff must show that because of her sex "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1195 (11th Cir. 2016) (quoting *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012)).  More specifically, a plaintiff must establish the following elements: "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  Here, GCH focuses on the fourth element.  It argues that Plaintiff cannot establish her hostile work environment claim because the sexual harassment she allegedly experienced was not sufficiently severe or pervasive to alter the terms and conditions of her employment.  (Doc. # 31 at p. 6-13).

The fourth element of a hostile work environment claim "contains both an objective and a subjective component." *Miller*, 277 F.3d at 1276. "Thus, to be actionable, this behavior must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)). Courts consider four factors in determining whether the conduct at issue is severe or pervasive enough to permeate a workplace: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* The conduct must be examined in context, not as isolated acts, and the court must determine under the totality of the circumstances whether the harassing conduct is severe or pervasive enough to alter the terms or conditions of a claimant's employment and create a hostile or abusive working environment. *Mendoza v. Borden Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068 (2000).

In assessing the severity of an employer's conduct, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."). Title VII "does not operate as a general ban on . . . rude or offensive behavior." *Leslie v. Cumulus Media, Inc.*, 814 F. Supp. 2d 1326, 1343 (S.D. Ala. 2011) (citation omitted); *see Mendoza*, 195 F.3d at 1245 ("Title VII is not a federal 'civility code.'"). "[S]imple teasing,

offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal citation and quotations omitted).

Here, Plaintiff offers the following evidence to support her sexually hostile work environment claim:[7]

- On one occasion, Patterson allegedly made a comment asking whether a female employee's pubic hair was the same color as the hair on her head. (Doc. # 32-2 at p. 25, 31).

- On one occasion, Patterson allegedly said that Plaintiff's brain was not big enough to fit up a gnat's behind. (*Id.* at p. 26, 31).

- On one occasion, Plaintiff asked Patterson where he had been and told him that someone had called him and he responded that he was in the bathroom and allegedly asked, "Did you want to hold it?" (*Id.* at p. 26, 31-32).

- On one or two occasions, Patterson allegedly showed Plaintiff a picture on his cell phone of a partially-clothed woman. (*Id.* at p. 32-33).

- On one occasion, Patterson allegedly commented on a female employee's physical appearance and said something to the effect of "she didn't have the rear, but she did have the bosoms." (*Id.* at p. 33-34).

- On fewer than five occasions, Patterson allegedly commented on a "dark-skinned" woman's shape or legs. (*Id.* at p. 34-36).

- On one occasion, Patterson allegedly talked with female employees about the clothes that they change into after work. (*Id.* at p. 36-37).

- On one occasion, Patterson allegedly asked Plaintiff, "Why don't you go get your hair did, you look butch?" (*Id.* at p. 37).

- On one occasion, Patterson and Plaintiff were talking about how another female employee's husband was treating that employee and Patterson allegedly said that he could take that female employee from her husband. (*Id.* at p. 38).

---

[7] The court does not consider some of the incidents that form the basis of Plaintiff's hostile work environment claim, such as asking a nurse if she got her nursing license from a Cracker Jack box and commenting on the intelligence of women in Greene County (Doc. # 34 at p. 18-19), because, while Plaintiff contends those things occurred, she has not demonstrated that she was aware of these communications. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014) (holding that a district court correctly declined to consider "evidence that the plaintiff did not know about" when evaluating whether the plaintiff had been exposed to an objectively hostile work environment).

- On one occasion, Patterson allegedly said something (likely in a joking manner) about paddling a female housekeeping employee while holding a hockey stick or oar. (*Id.* at p. 38-39).

- On an unknown number of occasions, Patterson told Plaintiff, "Don't speak, you're just a part of the room" during morning meetings with department heads. (*Id.* at p. 39-41).

- An unknown number of occasions when Patterson allegedly referred to a certain female employee as being "green," which Plaintiff interpreted to mean as "clueless, dumb, [or] stupid." (*Id.* at p. 41-42).

- On one occasion, Patterson allegedly stated that he needed a man over the purchasing department instead of the female purchasing supervisor with whom he was dissatisfied. (*Id.* at p. 42-43).

- On one occasion, Patterson allegedly said, "You think I'll sleep with these opossums around here?" (*Id.* at p. 43-44).

- On one occasion, Plaintiff heard Patterson call a female employee "dumb" to her face. (*Id.* at p. 44).

- On one occasion, Patterson and another female employee were not talking to each other. (*Id.* at p. 44).

These incidents allegedly occurred over approximately a two year period. (*Id.* at p. 25-44). Patterson denies Plaintiff's allegations of sexual harassment. (Doc. # 40 at p. 2-3). He admits to using profanity in the presence of employees. (*Id.* at p. 2). Marilyn Atkins, Vera Rice, and Cockrell also testified that Patterson made demeaning and intimidating comments to female employees. (Docs. # 35 at p. 46, 188; 36 at p. 18). Some of the comments that Plaintiff alleges Patterson made (such as the gnat statement, telling Plaintiff not to speak during morning meetings, calling an employee "green" and "dumb," and not being on speaking terms with an employee) do not have a sexual (or even a gender-related) connotation and, therefore, do not support Plaintiff's sexual harassment claim. *See Trask*, 822 F.3d at 1195 ("[O]nly conduct that is based on a protected category . . . may be considered in a hostile work environment analysis.") (internal quotations omitted).

"Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this [case]." *Mendoza*, 195 F.3d at 1246-47 (collecting cases); *see, e.g.*, *Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 804 (11th Cir. 2012) (finding that an employee's conduct of grabbing the plaintiff employee's "butt 'two to five times,'" "talk[ing] dirty" to the plaintiff, stating that he wanted to perform sexual acts with her, and asking the plaintiff on multiple dates despite her continued refusal was not objectively severe or pervasive to support a Title VII claim); *Leeth v. Tyson Foods, Inc.*, 449 F. App'x 849, 853 (11th Cir. 2011) (holding that conduct was not sufficiently severe or pervasive where a manager allegedly attempted to pull the plaintiff into his lap, made comments to the plaintiff about wanting to "ram his tongue down her throat," came to the plaintiff's house uninvited, and called her on multiple occasions to ask her to go out with him). Although Patterson's comments may have been degrading to Plaintiff, she simply has not presented sufficient evidence to survive summary judgment on the issue of severity or pervasiveness. *Compare Howard v. City of Robertsdale*, 168 Fed. App'x 883, 885, 889-90 (11th Cir. 2006) (holding that a supervisor's offensive comments about employees' bodies and sex lives and sexual jokes made in front of other employees on a regular basis did not rise to the level of objectively severe or pervasive harassment) *with Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 812 (11th Cir. 2010) (finding that evidence that an employer's offensive conduct occurred "every single day" and consisted of multiple derogatory terms aimed at women, evidence of vulgar sexual discussions, and evidence of the presence of pornographic images in the workplace, when viewed together, could allow a jury to draw a reasonable inference of pervasive harassment). Based upon the evidence in the summary judgment record, even taking each of Plaintiff's assertions as true, the court determines that a reasonable jury could not infer

from Patterson's comments that his conduct was sufficiently severe to change the terms or conditions of Plaintiff's workplace.

### B.    Remaining Title VII Claims

Plaintiff bundles three separate claims into Count Two of her Amended Complaint: (1) sexual harassment and gender discrimination based on the same facts in her sexually hostile work environment claim, (2) unlawful termination based on gender in violation of § 703(a) of Title VII, and (3) retaliation in violation of § 704 of Title VII.  (Doc. # 6 at p. 7-9).  As an initial matter, to the extent that Plaintiff's gender discrimination and sexual harassment claim is based on the same allegations as her sexually hostile work environment claim, this claim is merely duplicative and fails for the same reasons detailed above.  Moreover, Plaintiff's discriminatory termination claim based on gender fails because it is undisputed that Plaintiff was replaced by another female and Plaintiff has not offered any evidence (much less substantial evidence) that she was treated less favorably than a similarly-situated individual outside her protected class or discriminated against because of her gender.[8]  *See Maynard v. Bd. of Regents of Div. of Univ.s of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (noting that to prevail on a Title VII discrimination claim based on circumstantial evidence a plaintiff must show that she was replaced by a person outside of her protected class or was treated less favorably than a similarly-situated individual outside her protected class).  The court explores Plaintiff's other retaliation claim, in turn.

In the context of a Title VII retaliation claim, where proof of retaliatory intent is offered by way of circumstantial evidence, courts apply a burden-shifting scheme akin to the *McDonnell Douglas* framework.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir.

---

[8] Additionally, Plaintiff appears to have conceded this claim as she does not address it in her Opposition to Defendants' Motion for Summary Judgment.  (Doc. # 33).  Instead, Plaintiff focuses on her § 704 claim.  (*Id.* at p. 22-24).

1998). Under this framework, the plaintiff must first establish a prima facie case of retaliation. *Id.* To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there is some causal relationship between the two events. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (per curiam); *see Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). If the plaintiff makes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate reason for the adverse employment action. *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999). If the employer proffers a legitimate reason, the burden shifts back to the employee to show that the legitimate reason was pretext for prohibited retaliatory conduct. *Id.* The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

### 1. Prima Facie Case

Although the parties dispute whether Plaintiff's termination claim is barred,[9] they do not dispute that filing an EEOC charge is a protected activity or that termination is an adverse employment action. (Docs. # 31 at p. 24; 34 at p. 23). Accordingly, Plaintiff must establish that there was a causal connection between her filing of an EEOC charge and her termination. *Holifield*, 115 F.3d at 1566. As explained below, Plaintiff has failed to establish a prima facie case of retaliation.

---

[9] Defendants argue that any claim based on Plaintiff's termination is barred because Plaintiff failed to exhaust her administrative remedies for claims related to her discharge. (Docs. # 31 at p. 16-18; 40 at p.8-9). Defendants base this argument on the unpublished opinion *Duble v. Fedex Ground Package Sys., Inc.*, 572 F. App'x 889 (11th Cir. 2014). In *Duble*, the court found that the plaintiff failed to exhaust his administrative remedies for a retaliation claim premised on a post-charge retaliation. 572 F. App'x 889. The court finds it unnecessary to explore the merits of this argument and *Duble*'s application to this case because, as discussed below, Plaintiff's retaliation claim fails on substantive grounds.

In order to establish a causal link, a plaintiff "need only establish that the protected activity and the adverse action were not wholly unrelated." *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999) (internal quotations omitted). "[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). A three-month gap between the statutorily protected activity and the adverse employment action has been found to be insufficient to establish temporal proximity. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006).

In this case, Plaintiff's filing of an EEOC charge and termination were eighty-four days apart. (Docs. # 32-1 at ¶ 12; 32-1 at p. 14; 32-2 at p. 64, 165-67). The court finds that this nearly three-month time frame is insufficient to establish close temporal proximity in the absence of other evidence establishing causation. *See Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 230 (11th Cir. 2011) (noting that a "two-month gap may be 'closer' in time, but it is not 'very close'"); *see also Drago v. Jenne*, 453 F.3d at 1308 (holding that a three-month time gap was insufficient to establish a close temporal proximity). Plaintiff concedes that "a three-month time lapse does not constitute close temporal proximity" but asserts that there is other evidence to show causation. (Doc. # 34 at p. 23-25). However, the evidence that Plaintiff offers does not establish the requisite causal link. Rather, this evidence consists of Plaintiff's testimony that she complained to other co-workers and board members and "Patterson's habit of threatening to terminate female employees." (Doc. # 34 at p. 24). Plaintiff's complaints about Patterson to non-decisionmakers do not illustrate that Patterson (the person who terminated Plaintiff) was aware of these complaints or that these complaints had any bearing on Patterson's decision to

terminate Plaintiff.  *See Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[T]he plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression . . . .").  Plaintiff's loose allegation that Patterson threatened employees who "question[ed] his judgment" with termination also does not link Plaintiff's termination to her filing of an EEOC complaint or, more generally, link Patterson's comments to retaliation for protected conduct.  Because Plaintiff has failed to establish a causal connection, she has not made a prima facie case of retaliation.  *See Holifield*, 115 F.3d at 1566.

### 2.    Pretext

Even if Plaintiff could establish a prima facie case of retaliation (and, to be clear, she has not), her claim fails for an alternative reason: she cannot show that Defendant's articulated reason for terminating her employment is pretextual.  The court analyzes this issue below.

When a plaintiff establishes a prima facie case, an employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2012).  Analysis of whether the employer has met this burden involves no credibility determination.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).  An employer's burden in providing a legitimate reason is "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).  After an employer articulates one or more legitimate, nondiscriminatory reason for the employment action, a plaintiff must show that the proffered reason was a pretext for illegal discrimination.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot simply recast the reason, but must "meet that reason head on and rebut it."  *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of

material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

Defendants assert that Plaintiff was terminated (1) because she disclosed personal email addresses of board members to a debt collector and (2) because of her dishonesty related to these events. (Docs. # 32-1 at ¶ 12; 32-1 at p. 14; 32-2 at p. 6). When Patterson asked Plaintiff whether she had disclosed these personal email addresses she denied doing so. (Docs. # 31 at ¶ 14-15; 32-1 at p. 11-12). However, the debt collector later confirmed that Plaintiff had indeed provided these email addresses (Doc. # 32-1 at ¶ 11), and Plaintiff later admitted that she *may* have done so. (Doc. # 32-2 at p. 65). Plaintiff has also admitted that Patterson had previously directed her to send all debt collection calls to Grisby, another GCH employee, and that she was not authorized to disclose board members' personal email addresses. (Doc. # 32-2 at p. 192-93). The court finds that GCH has easily met its "exceedingly light" burden in articulating a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Perryman*, 698 F.2d at 1142.

In her attempt to show pretext, Plaintiff directly contradicts her admission that she was not authorized to disclose board members' personal email addresses to creditors. She states that email was the routine method of contacting board members, that GCH's policies allowed for information about hospital volunteers (such as board members) to be relayed to others in appropriate circumstances,[10] and that she believed that she was merely following the chain of command when she disclosed these personal email addresses to a creditor. (Doc. # 34 at p. 25-26). But Plaintiff's reasoning conflicts with her own admission. It does not "create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is

---

[10] This policy is applicable for appropriate circumstances "within the institution." (Doc. # 40 at p. 10 n.7). It does not apply to third-party debt collectors. (*See id.*).

pretextual." *Chapman*, 229 F.3d at 1024-25.  Furthermore, Plaintiff has not rebutted Defendants' other reason for terminating her: dishonesty in denying to Patterson that she disclosed these email addresses.  *See id.* at 1037 ("[A] plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual.") (emphasis added).  Because Plaintiff has failed to establish a prima facie case or pretext, her retaliation claim is due to be dismissed.

### C.      State Law Outrage Claim

The elements of the tort of outrage, also known as the tort of intentional infliction of emotion distress in Alabama, are that (1) "the defendant's conduct was intentional or reckless," (2) the conduct "was extreme and outrageous," and (3) the conduct "caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Crawford & Co.*, 693 So. 2d 458, 460 (Ala. 1997).  In *Potts v. Hayes*, 771 So. 2d 462 (Ala. 2000), the Alabama Supreme Court stated that it has recognized the tort of outrage "in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment."  *Id.* at 465 (internal citations omitted).  These three kinds of categories are not necessarily the only sufficient types of conduct that could plausibly plead intentional infliction of emotional distress.[11]  *Little v. Robinson*, 72 So. 3d 1168, 1172-73 (Ala. 2011).  Nevertheless, the guiding inquiry is ultimately whether a plaintiff has alleged facts "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).  Whether

---

[11]   In *O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011), *abrogated in part on other grounds by Ex parte Vanderwall*, 201 So. 3d 525 (Ala. 2015), the Alabama Supreme Court "affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction."  *Little v. Robinson*, 72 So. 3d 1168, 1172-73 (Ala. 2011).

a claim presents the requisite level of outrageousness to sustain a claim for intentional infliction of emotional distress is a question of law. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1258 (11th Cir. 2016).

Here, Plaintiff has failed to establish an outrage claim because the conduct she premises this claim upon does not rise to the level of "extreme and outrageous" or conduct "so severe that no reasonable person could be expected to endure it." *Ex parte Crawford & Co.*, 693 So. 2d at 460. Even when construing all facts in a light most favorable to Plaintiff, Patterson's alleged derogatory comments are not analogous to the three categories of conduct deemed outrageous in *Potts*, 771 So. 2d at 465. Nor is this alleged conduct analogous to the sexual misconduct and professional misconduct deemed outrageous in *O'Rear*, 69 So. 3d at 118-19. Furthermore, Plaintiff has not offered any evidence, such as medical treatment or medication, to illustrate the severity of her emotional distress. Rather, she relies on her own generalized testimony, which is insufficient to show severe emotional distress. *See, e.g.*, *Ex parte Mut. Sav. Life Ins. Co.*, 698 So. 2d 772, 775 (Ala. 1997) (finding that a plaintiff did not establish the proof necessary to substantiate the high standard associated with an outrage); *Habich v. Crown Cent. Petroleum Corp.*, 642 So. 2d 699, 701 (Ala. 1994) (holding that a plaintiff employee who was abducted and raped while working on her employer's premises failed to establish the tort of outrage against her employer because she presented no evidence that her employer's behavior approached the degree of severity required to establish outrage); *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1045 (Ala. 1993) (finding that generalized fears do not rise to the level of extreme emotional distress). Because the facts underlying Plaintiff's outrage claim cannot support such a claim under Alabama law, this claim is due to be dismissed. *See Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012) (explaining that the "tort of outrage does not recognize recovery for mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities") (internal quotations omitted).

### D.  State Law Negligent Training, Supervision, and Retention Claim

In order to prove a claim under Alabama law for negligent training, supervision, or retention, "a plaintiff must demonstrate that the employer knew, or in the exercise of ordinary care should have known, that its employee was incompetent." *Britt v. USA Truck, Inc.*, No. 2:06-cv-868-ID, 2007 WL 4554027, at *4 (M.D. Ala. 2007) (citing *Armstrong Bus. Servs. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001) (negligent supervision); *Brown v. Vanity Fair Mills, Inc.*, 277 So. 2d 893, 895 (Ala. 1973) (negligent retention); *Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala. Civ. App. 2000) (negligent hiring)); *see Sears v. PHP of Alabama, Inc.*, No. 2:05-cv-304-ID, 2006 WL 932044, at *19 n.13 (M.D. Ala. Apr. 10, 2006) ("The court observes that there is no discernible distinction between claims of negligent supervision and claims of negligent training, and, thus the court treats these two claims as one.") (citing *Zielke v. AmSouth Bank, N.A.*, 703 So. 2d 354, 358 n.1 (Ala. Civ. App. 1996). Furthermore, a plaintiff must establish two additional elements: (1) that the underlying conduct of one or more employees was wrongful or tortious and (2) that Defendant had actual or constructive knowledge of that alleged incompetence. *See Hester v. Brown*, 512 F. Supp. 2d 1228, 1238 (M.D. Ala. 2007). That is, not just any "incompetency" suffices to give rise to a cause of action for so-called negligent training, supervision, and retention liability. *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999). Instead, a plaintiff must prove that an allegedly incompetent employee committed a tort which is recognized under Alabama common law. *See id.*

In this case, Plaintiff has failed to present substantial evidence to support her outrage claim, which is the only underlying state tort she alleges in this action. Because Plaintiff has failed to establish an underlying tort (which is the first element required for a negligent training, supervision, or retention claim), her negligence claims fails as a matter of law, and this claim is due to be dismissed. *See Stevenson*, 762 So. 2d at 824.

**V.      Conclusion**

For all of these reasons, the court concludes that Defendants' Motion for Summary Judgment is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this May 23, 2018.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE